## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ARTUR DE ALBUQUERQUE TORRES,
derivatively on behalf of ALEXANDRIA REAL
ESTATE EQUITIES, INC.,

c/o Timothy Brown Esq.
The Brown Law Firm, P.C.
767 Third Avenue,
Suite 2501
New York, NY 10017

     *Plaintiff*,

     v.

ALEXANDRIA REAL ESTATE EQUITIES,
INC.,
26 North Euclid Avenue
Pasadena, CA 91101

     Serve on:
     CSC-LAWYERS INCORPORATING
     SERVICE COMPANY
     7 St. Paul Street
     Suite 820
     Baltimore, MD 21202

     *Nominal Defendant*,

and

PETER M. MOGLIA
c/o Alexandria Real Estate Equities, Inc.,
26 North Euclid Avenue
Pasadena, CA 91101

and

MARC E. BINDA
c/o Alexandria Real Estate Equities, Inc.,
26 North Euclid Avenue
Pasadena, CA 91101

and

Case No. 1:26-00445

**DEMAND FOR JURY TRIAL**

JOEL S. MARCUS
c/o Alexandria Real Estate Equities, Inc.,
26 North Euclid Avenue
Pasadena, CA 91101

and

CLAIRE ALDRIDGE
c/o Alexandria Real Estate Equities, Inc.,
26 North Euclid Avenue
Pasadena, CA 91101

and

JAMES P. CAIN
c/o Alexandria Real Estate Equities, Inc.,
26 North Euclid Avenue
Pasadena, CA 91101

and

MARIA C. FREIRE
c/o Alexandria Real Estate Equities, Inc.,
26 North Euclid Avenue
Pasadena, CA 91101

and

STEVEN R. HASH
c/o Alexandria Real Estate Equities, Inc.,
26 North Euclid Avenue
Pasadena, CA 91101

and

RICHARD H. KLEIN
c/o Alexandria Real Estate Equities, Inc.,
26 North Euclid Avenue
Pasadena, CA 91101

and

SHEILA K. MCGRATH
c/o Alexandria Real Estate Equities, Inc.,
26 North Euclid Avenue
Pasadena, CA 91101

and

MICHAEL A. WORONOFF
c/o Alexandria Real Estate Equities, Inc.,
26 North Euclid Avenue
Pasadena, CA 91101

     *Defendants*.

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Artur de Albuquerque Torres ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Alexandria Real Estate Entities, Inc. ("Alexandria" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Peter M. Moglia ("Moglia"), Marc E. Binda ("Binda"), Joel S. Marcus ("Marcus"), Claire Aldridge ("Aldridge"), James P. Cain ("Cain"), Maria C. Freire ("Freire"), Steven R. Hash ("Hash"), Richard H. Klein ("Klein"), Sheila K. McGrath ("McGrath"), and Michael A. Woronoff ("Woronoff") (collectively, the "Individual Defendants," and together with Alexandria, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Alexandria, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Moglia, Binda, and Marcus for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Alexandria, legal filings, news reports, securities analysts'

3

reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from January 27, 2025 through October 27, 2025, both dates inclusive (the "Relevant Period").

2.     Alexandria is a Maryland corporation headquartered in Pasadena, CA, chiefly engaged in the development, maintenance, and renting of life science-based properties. To this end, the Company identifies and acquires Class A/A+ properties clustered around other life science-based properties.

3.     Notably, the Company focuses its efforts around major academic and medical research institutions. In addition to purchasing property, the Company engages in development projects to construct life science structures such as generic and reusable laboratory facilities.

4.     Given the nature of the properties owned by the Company, its primary tenants include, *inter alia*, multinational pharmaceutical companies, academic and medical research institutions, and both public and private biotechnology companies.

5.     During the Relevant Period, the Individual Defendants made repeated assertions concerning the Company's expected revenue and funds from operations ("FFO") growth for the 2025 fiscal year. More specifically, the Individual Defendants made these assertions in the context of the Company's real estate operations. However, the Individual Defendants concealed the true nature of the Company's financial prospects, particularly regarding the Company's Long Island City Property (the "LIC Property").

6.      For instance, on January 28, 2025, the Company hosted an earnings call to discuss its financial results for the fourth quarter of 2024 with investors and analysts (the "Q4 2024 Earnings Call"). During the Q4 2024 Earnings Call, Defendant Binda stated the following, in relevant part: "***Our outlook for full year '25 same-property growth is consistent with our prior outlook at down 2% and flat on a cash basis at the midpoint.***"[1]

7.      The truth emerged on October 27, 2025, when the Company issued a press release to announce its financial results for the third quarter of 2025 (the "Q3 2025 Press Release"). The Q3 2025 Press Release reported that the Company's financial results for the quarter fell below expectations, and that the Company was cutting its FFO guidance for 2025. Moreover, the Q3 2025 cited slower leasing activity, lower occupancy rates, and real estate impairment charges as the main reasons for the Company's results. The next day, on October 28, 2025, the Individual Defendants continued to elaborate on these negative disclosures during a corresponding earnings call to discuss the Company's third quarter financial results with investors and analysts (the "Q3 2025 Earnings Call").

8.      On this news, the price per share of the Company's common stock fell $14.93, or roughly 19.2%, from a closing price of $77.87 per share on October 27, 2025 to close at $62.94 per share on October 28, 2025.

9.      During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and/or directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading

---

[1] Unless otherwise stated, all emphasis is added.

statements that failed to disclose, *inter alia*, that: (1) the Company's properties were experiencing lower occupancy rates and slower leasing activity; (2) the Company faced substantial real estate impairment charges with the majority of such charges being attributed to the Company's LIC Property; (3) as a result of the lower occupancy rates, declining leasing activity, and real estate impairment charges, the Company would have to slash its FFO guidance for the full 2025 year; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

10.     The Individual Defendants also failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

11.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls while two of the Individual Defendants engaged in lucrative insider trading, reaping combined personal proceeds of ***approximately $702,305***.

12.     Additionally, the Individual Defendants caused the Company substantial harm by causing it to repurchase its own shares at artificially inflated prices. In total, the Company spent an aggregate amount of ***approximately $58.2 million*** to repurchase approximately 610,319 shares of its own common stock at artificially inflated prices from February 2025 to October 2025. In total, this caused the Company to overpay for repurchases of its own stock by approximately $19.8 million.

13.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO") and Chief Investment Officer ("CIO"), its Chief Financial Officer ("CFO"), and its founder and Executive Chairman of the Board to a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

15.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, of the CEO's, the CFO's, the Executive Chairman of the Board's and the Company's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

20.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

21.    Plaintiff is a current shareholder of Alexandria. Plaintiff has continuously owned Company common stock at all relevant times.

### Nominal Defendant Alexandria

22.    Alexandria is a Maryland corporation with its principal executive offices at 26 North Euclid Avenue, Pasadena, California 91101. Alexandria's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ARE."

### Defendant Moglia

23.     Defendant Moglia has served as the Company's CEO since July 2022 and as the Company's CIO since September 2023. Previously, Defendant Moglia served as the Company's Co-CEO from April 2018 through July 2022, as Co-CIO from May 2018 through September 2023, and as CIO from January 2009 through April 2018.

24.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Moglia made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 1/31/2025 | 743 | $97.35 | $72,331 |
| 2/28/2025 | 743 | $102.26 | $75,979 |
| 3/31/2025 | 743 | $92.51 | $68,735 |
| 4/30/2025 | 744 | $72.66 | $54,059 |
| 5/30/2025 | 743 | $70.19 | $52,151 |
| 6/30/2025 | 743 | $72.63 | $53,964 |
| 7/31/2025 | 743 | $76.43 | $56,788 |
| 8/29/2025 | 744 | $82.44 | $61,335 |
| 9/30/2025 | 743 | $83.34 | $61,922 |

Thus, in total, before the fraud was exposed, he sold 6,689 shares of Company common stock on inside information, for which he received approximately $557,264 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

25.     The Schedule 14A the Company filed with the SEC on April 2, 2025 (the "2025 Proxy Statement") stated the following about Defendant Moglia:

**Peter M. Moglia** has served as Chief Executive Officer since July 2022 and as Chief Investment Officer since September 2023. He previously served as Co-Chief Executive Officer from April 2018 through July 2022, as Co-Chief Investment Officer from May 2018 through September 2023, and as Chief Investment Officer from January 2009 through April 2018, and has been serving the Company in many important capacities since April 1998. From April 2003 through December 2008, he was responsible for the management of the Company's Seattle region asset base and operations. From 1998 to 2003, Mr. Moglia's responsibilities were focused on underwriting, acquisitions, and due diligence activities. Prior to joining the Company, he served as an Analyst for Lennar Partners, Inc., a diversified real estate

company, where his responsibilities included underwriting and structuring direct and joint venture real estate investments. Mr. Moglia began his real estate career in the Management Advisory Services group within the Kenneth Leventhal & Co. Real Estate Group, where he spent six years providing valuation, feasibility, financial modeling, and other analytical services to real estate developers, financial institutions, pension funds, and government agencies. Mr. Moglia serves on the Nareit Advisory Board of Governors and on the boards of Team Prime Time and Chaminade College Preparatory. He received his Bachelor of Arts degree in Economics from the University of California, Los Angeles.

**Defendant Binda**

26.     Defendant Binda has served as the Company's CFO since September 2023, and as the Company's Treasurer since April 2018. Defendant Binda previously served as the Company's Executive Vice President – Finance from June 2019 to September 2023 and as the Company's Senior Vice President – Finance from April 2012 to June 2019.

27.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Binda made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 9/15/2025 | 1,695 | $85.57 | $145,041 |

Thus, in total, before the fraud was exposed, he sold 1,695 shares of Company common stock on inside information, for which he received $145,041 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

28.     The 2025 Proxy Statement stated the following about Defendant Binda:

**Marc E. Binda** has served as Chief Financial Officer since September 2023 and Treasurer since April 2018. Mr. Binda previously served as Executive Vice President – Finance from June 2019 to September 2023, Senior Vice President – Finance from April 2012 to June 2019, and in other capacities from January 2005 to April 2012. Since joining the Company, Mr. Binda has served in a variety of positions of increasing responsibility within the finance and accounting functions. Mr. Binda oversees the Company's treasury strategies and risk management, financial projections, capital planning, debt financing, and other capital market

transactions and provides business and technical advice on unique and complex real estate, joint venture, and leasing transactions. Prior to joining the Company, Mr. Binda was a Financial Reporting Manager at Watt Centro Management JV, LP ("Watt"), where he was responsible for accounting, finance, and treasury matters, REIT compliance, debt compliance, and U.S. and Australian GAAP reporting. Prior to joining Watt, Mr. Binda was a manager in Ernst & Young LLP's Real Estate Advisory Business Services group, where he served three publicly traded REITs and other public and private companies. Mr. Binda is a certified public accountant and received his Bachelor of Science degree in Accounting from California Lutheran University.

### Defendant Marcus

29.     Defendant Marcus is the Company's founder and has served as its Executive Chairman of the Board since April 23, 2018. Previously, Defendant Marcus served as the Company's CEO and President from the Company's founding in 1994 to April 2018. Defendant Marcus is also a member of the Life Science Committee.

30.     The 2025 Proxy Statement stated the following about Defendant Marcus, in relevant part:

**Joel S. Marcus, JD, CPA**, is the full-time Executive Chairman and Founder of Alexandria, a real estate investment trust ("REIT") that pioneered life science real estate and transformed it from a specialty niche to an important mainstream asset class. Alexandria is the preeminent, largest, and longest-tenured owner, operator, and developer uniquely focused on collaborative Megacampus™ ecosystems in AAA life science innovation cluster locations. Prior to April 2018, Mr. Marcus served as the Company's Chairman, Chief Executive Officer, and President.

*** 

During Mr. Marcus's more than three decades leading Alexandria, he has built a best-in-class company with a differentiated business model and a unique mission — to create and grow life science ecosystems and clusters to advance human health — that continue to distinguish Alexandria from all other REITs. Guided by Alexandria's mission, Mr. Marcus established four strategic and integrated verticals encompassing real estate, venture investments, thought leadership, and corporate responsibility that together catalyze life-changing innovation and drive positive change for the benefit of human health and society.

### Defendant Aldridge

31.    Defendant Aldridge has served as a Company director since March 14, 2025, and currently serves as a member of the Life Science Committee.

32.    The 2025 Proxy Statement stated the following about Defendant Aldridge:

**Claire Aldridge, PhD**, has served as a director since March 2025. Dr. Aldridge currently serves on the Scientific Advisory Board of Colossal Biosciences Inc. and on the board of directors of 4E Therapeutics, Inc. Previously, Dr. Aldridge was the Chief Strategy Officer of Form Bio, Inc., the first spinout from the de-extinction and biodiversity company Colossal Biosciences Inc., from July 2022 to August 2024. At Form Bio, Inc., Dr. Aldridge led the integration of artificial intelligence (AI) and machine learning into genomic analysis and advanced therapeutics programs, such as gene therapy, biological sequence alignment, and directed evolution to accelerate the development of safe and effective new medicines. She also oversaw the generation of vast proprietary datasets needed to train sophisticated AI models. Dr. Aldridge also previously served as Senior Vice President, Chief of Staff and Business Operations at Taysha Gene Therapies, Inc. (NASDAQ: TSHA) from July 2021 to April 2022; as Associate Vice President of Commercialization and Business Development at The University of Texas Southwestern Medical Center from April 2019 to February 2021; and as Vice President, Venture Development at Remeditex Ventures from July 2011 to April 2019. Dr. Aldridge sits on the Product Development Advisory Committee of the Cancer Prevention and Research Institute of Texas (CPRIT), the $6 billion state agency established to help Texans conquer cancer through research, prevention, and commercialization. She is also a founding advisor for Nucleate Texas, a non-profit organization empowering the next generation of biotechnology leaders. Additionally, she participates in Duke University's Entrepreneurial Leaders Network, which consists of a select group of Duke students and alumni who are focused on translating Duke discoveries into innovative startups, and is Past Chair of the Industrial Advisory Board of the Department of Bioengineering at The University of Texas at Dallas. In April 2023, Dr. Aldridge was named one of Forbes' 10 women leading the synthetic biology revolution. Dr. Aldridge received her PhD from Duke University in the Department of Immunology and the Program in Genetics and Genomics and her Bachelor of Science degree in Biomedical Science from Texas A&M University.

Dr. Aldridge's qualifications to serve on the Board include her 25 years of experience in the biotechnology and life science industries, her venture capital investment expertise, and her leadership in training and integrating AI and machine learning into genomic analysis and advanced therapeutics programs.

**Defendant Cain**

33.    Defendant Cain has served as a Company director since December 2015.

Defendant Cain currently serves as the Chair of the Nominating & Governance Committee, as a member of the Compensation Committee, and as a member of the Life Science Committee.

34.     The 2025 Proxy Statement stated the following about Defendant Cain:

**Ambassador James P. Cain** has served as a director since December 2015. He is the Managing Partner of Cain Global Partners, LLC, a company that provides a vital link between the developed and emerging markets of the world by utilizing its network of diplomatic, political, and corporate resources. As a partner at Cain Global Partners, Ambassador Cain works with North American and European companies to expand their operations into international markets (such as Asia, Latin America, Eastern Europe, and the Middle East), as well as to support economic development and public policy interests. His career has spanned the fields of leadership, law, business, sports, and international diplomacy, and he has mastered the skills of building lasting relationships as well as strong ecosystems. Ambassador Cain's unique combination of expertise and passion for business and leadership has been instrumental in his role in developing the Research Triangle Park innovation cluster. For 20 years, Ambassador Cain was a partner at the international law firm of Kilpatrick Townsend & Stockton LLP (formerly known as Kilpatrick Stockton), where he co-founded the firm's Raleigh office in 1985. He continues to serve as counsel to Kilpatrick Townsend & Stockton. From 2000 to 2002, Ambassador Cain served as the President and Chief Operating Officer of the NHL Carolina Hurricanes and its parent company, Gale Force Holdings. Later, during his tenure as the U.S. Ambassador to Denmark, a position for which he was nominated by President George W. Bush on June 30, 2005 (to serve until January 2009), Ambassador Cain called upon not only his leadership and relationship-building skills but also his experience from his time working with the Carolina Hurricanes. As Ambassador, he oversaw the 13 agencies of the American government that composed the U.S. Embassy in Copenhagen, where he focused his energies on areas of national security, counter-terrorism, energy security, commerce, and investment. He received his Bachelor of Arts and Juris Doctor degrees from Wake Forest University.

Ambassador Cain's qualifications to serve on the Board include his extensive leadership and relationship-building skills, which he acquired from various positions, including his current position as managing partner of Cain Global Partners, LLC, his former positions as a partner at Kilpatrick Townsend & Stockton LLP and U.S. Ambassador to Denmark, as well as his broad management, legal, and business experience.

**Defendant Freire**

35.     Defendant Freire has served as a Company director since April 2012. Defendant Freire also currently serves as the Chair of the Life Science Committee and as a member of the

Nominating & Governance Committee.

36.    The 2025 Proxy Statement stated the following about Defendant Freire:

**Maria C. Freire, PhD**, has served as a director since April 2012. From November 2012 until September 2021, Dr. Freire served as the President and Executive Director, and a member of the board of directors, of The Foundation for the National Institutes of Health ("FNIH"), a Congressionally authorized independent organization that draws together the world's foremost researchers and resources in support of the mission of the National Institutes of Health ("NIH"). Prior to her appointment to the FNIH, Dr. Freire was the President and a member of the board of directors of the Albert and Mary Lasker Foundation, a non-profit organization that bestows the Lasker Awards in basic and clinical science and advocates for medical research. From 2001 to 2008, Dr. Freire served as President and Chief Executive Officer of the Global Alliance for TB Drug Development, a public-private partnership that develops better, faster-acting, and affordable drugs to fight tuberculosis. An expert in technology commercialization, she directed the Office of Technology Transfer at the NIH from 1995 to 2001 and served as a commissioner on the World Health Organization's Commission on Intellectual Property Rights, Innovation and Public Health. Dr. Freire obtained her Bachelor of Science degree from the Universidad Peruana Cayetano Heredia in Lima, Peru, and her PhD in Biophysics from the University of Virginia; she completed post-graduate work in Immunology and Virology at the University of Virginia and the University of Tennessee. She is currently a director at Exelixis, Inc. (NASDAQ: EXEL) and Biogen (NASDAQ: BIIB) and was previously a director at Koneksa Health Inc. She has previously served on the Science Board of the Food and Drug Administration and as a member of the Commission on a Global Health Risk Framework for the Future of the Institute of Medicine, among others. Her awards include the Department of Health and Human Services Secretary's Award for Distinguished Service, the Arthur S. Flemming Award, the Bayh-Dole Award, the 2017 Washington Business Journal's "Women Who Mean Business" Award, the 2017 Gold Stevie Award for "Woman of the Year," and NonProfit PRO's 2019 "Executive of the Year" Award. Dr. Freire is a member of the U.S. National Academy of Medicine and the Council on Foreign Relations.

Dr. Freire's qualifications to serve on the Board include her technical scientific expertise and her broad base of experience in the pharmaceutical and biotechnology industries, including her extensive experience in technology commercialization. In addition, her involvement with a wide range of not-for-profit medical research organizations provides her with a wealth of relationships in the medical research community, as well as a user's perspective on the needs of major research organizations in key industry sectors within the Company's tenant base.

**Defendant Hash**

37.    Defendant Hash has served as a Company director since December 2013 and is

currently the Lead Director of the Board. Defendant Hash currently serves as the Chair of the

Compensation Committee and as a member of the Audit Committee.

38.    The 2025 Proxy Statement stated the following about Defendant Hash:

**Steven R. Hash** has served as a director since December 2013 and has served as
Lead Director since March 2016. Mr. Hash is the prior President and Chief
Operating Officer, and Co-Founder of Renaissance Macro Research, LLC, an
equity research and trading firm focused on macro research in the investment
strategy, economics, and Washington policy sectors, which he co-founded in 2012
and for which he served as the President and Chief Operating Officer until April
2020, and as a consultant until December 2020. Between 1993 and 2012, Mr. Hash
held various leadership positions with Lehman Brothers (and its successor,
Barclays Capital), including Global Head of Real Estate Investment Banking from
2006 to 2012, Chief Operating Officer of Global Investment Banking from 2008 to
2011, Director of Global Equity Research from 2003 to 2006, Director of U.S.
Equity Research from 1999 to 2003, and Senior Equity Research Analyst from 1993
to 1999. From 1990 to 1993, Mr. Hash held various positions with Oppenheimer &
Company's Equity Research Department, including senior research analyst. He
began his career in 1988 as an auditor for the accounting and consulting firm of
Arthur Andersen & Co. He has served as a director of The Macerich Company
(NYSE: MAC) since May 2015 (and is currently Non-Executive Chairman of the
board of directors), as the lead director of Nuveen Global Cities REIT, Inc., a non-
traded REIT, since January 2018, and as a director of DiamondPeak Holdings Corp.
(NASDAQ: DPHC) from February 2019 to October 2020. Mr. Hash received a
Bachelor of Arts degree in Business Administration from Loyola University and a
Master of Business Administration degree from the Stern School of Business at
New York University.

Mr. Hash's qualifications to serve on the Board include his financial expertise and
extensive knowledge of the real estate industry, which he acquired from various
positions, including his former positions as Global Head of Real Estate Investment
Banking with Lehman Brothers (and its successor, Barclays Capital) and President
and Chief Operating Officer of Renaissance Macro Research, LLC.

**Defendant Klein**

39.    Defendant Klein has served as a Company director since December 2003.

Defendant Klein currently serves as the Chair of the Audit Committee, and as a member of the

Compensation Committee.

40.    The 2025 Proxy Statement stated the following about Defendant Klein:

15

**Richard H. Klein, CPA**, has served as a director since December 2003. Mr. Klein has a diverse background spanning more than 30 years as a senior advisor to a variety of domestic and international businesses, with a particular focus on real estate organizations. He currently serves as Chief Financial Officer of Industrial Realty Group, LLC, a privately held owner and developer of commercial and industrial properties with a 110 million SF portfolio located throughout the United States. From 2012 to 2015, Mr. Klein served as an independent business consultant. In 2003, Mr. Klein founded Chefmakers Cooking Academy LLC, which provided culinary education services and experiences and for which he served as Chief Executive Officer through 2011. From 1984 to 2000, Mr. Klein was with Ernst & Young LLP and a predecessor firm, Kenneth Leventhal & Company. From 1978 to 1983, Mr. Klein provided tax consulting and auditing services for PwC. At these firms, Mr. Klein served in a variety of capacities, including as partner in the REIT Advisory Practice, the Financial Restructuring and Insolvency Practice, and the Public Relations and Practice Development Department. Mr. Klein is a certified public accountant in the State of California. He received his Bachelor of Science degree in Accounting and Finance from the University of Southern California.

Mr. Klein's qualifications to serve on the Board include his extensive experience and knowledge of the real estate industry, and REITs in particular, and the accounting and financial expertise he developed as a certified public accountant and partner of Ernst & Young LLP.

### **Defendant McGrath**

41.     Defendant McGrath has served as a Company director since December 2023.

Defendant McGrath currently serves as a member of the Life Science Committee.

42.     The 2025 Proxy Statement stated the following about Defendant McGrath:

**Sheila K. McGrath** has served as a director since December 2023. Ms. McGrath was a senior managing director at Evercore ISI covering U.S. equity REITs, real estate operating companies, and Mexican real estate investment vehicles, or FIBRAs, from 2012 until 2022. Prior to joining Evercore ISI, she was managing director and sector head for REIT research at Keefe, Bruyette & Woods for five years and was a member of the firm's Research Review Committee and Leadership Committee. Between 1994 and 2007, Ms. McGrath covered REITs and real estate operating companies as an equity research analyst at several firms, including Smith Barney and UBS. She began her career as a commercial real estate appraiser valuing various commercial real estate properties across most property sectors and conducting feasibility studies for new development projects. Ms. McGrath is currently a director at Granite Point Mortgage Trust Inc. (NYSE: GPMT), Mid-America Apartment Communities Inc. (NYSE: MAA), and New Mountain Net Lease Trust. She is also an active member of Nareit, where she currently serves on

the Advisory Board of Governors and the Real Estate Investment Advisory Council and previously served on the Best Financial Practices Council. Ms. McGrath also serves on the board of advisors of the Rutgers Business School's Center for Women in Business, of which she was a founding member. She received her Bachelor of Arts degree in Economics from Lafayette College and her Master of Business Administration degree in Finance from Rutgers University.

Ms. McGrath's qualifications to serve on the Board include her technical financial expertise and broad base of experience in the real estate industry, including her extensive knowledge in equity REITs and commercial real estate, which she acquired from various positions, including her most recent position as a senior managing director at Evercore ISI. She also serves on the board of directors of commercial real estate finance company Granite Point Mortgage Trust Inc. and on several advisory boards of Nareit.

**Defendant Woronoff**

43.    Defendant Woronoff has served as a Company director since July 2017. Defendant Woronoff currently serves as a member of the Audit Committee, as a member of the Nominating & Governance Committee, and as a member of the Life Science Committee.

44.    The 2025 Proxy Statement stated the following about Defendant Woronoff:

**Michael A. Woronoff** has served as a director since July 2017. Currently a Partner at Kirkland & Ellis LLP, he advises clients on a variety of corporate and securities law matters, including SEC reporting obligations, corporate governance, and strategic alliances. The Daily Journal named him nine times as one of the "Top 100 Lawyers in California." Prior to joining K&E in 2019, he was a partner at Proskauer Rose LLP, head of Proskauer's Los Angeles office, co-head of its international Private Equity/M&A group, and a member of the firm's executive committee. Prior to joining Proskauer in 2004, Mr. Woronoff co-founded and was a principal of Shelter Capital Partners, a Southern California-based private equity fund that invested in technology and technology-enabled businesses. Prior to joining Shelter in 2000, Mr. Woronoff was a partner of Skadden, Arps, Slate, Meagher & Flom LLP, where he practiced corporate and securities law for 15 years. For over 20 years, he has lectured at UCLA's School of Law, where he developed and teaches the popular course, "Venture Capital and the Start-Up Company." Mr. Woronoff serves as a member of the Board of Trustees of Commentary magazine; a director and Chair of the finance committee of the non-profit Alliance College-Ready Public Schools Foundation; a member of the Leadership Cabinet of the Board of Governors of Cedars-Sinai, a non-profit academic healthcare organization; and a Business Fellow and member of the Dean's Advisory Council of the Mitchell E. Daniels, Jr. School of Business at Purdue University. He received a Juris Doctor degree from the University of Michigan Law School and both a Master of Science

in Industrial Administration and a Bachelor of Science in Industrial Management from Purdue University.

Mr. Woronoff's qualifications to serve on the Board include his management and financial expertise and extensive knowledge of the corporate and securities law, SEC reporting, corporate governance, and strategic alliances, which he acquired from various positions, including his current position as a partner of K&E, and his former positions as a principal of Shelter and as a partner of both Proskauer and Skadden. He has also served on the boards of directors of several start-up and emerging companies, including AccessDNA, TransDimension, and u-Nav Microelectronics.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

45.    By reason of their positions as officers, directors, and/or fiduciaries of Alexandria and because of their ability to control the business and corporate affairs of Alexandria, the Individual Defendants owed Alexandria and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Alexandria in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Alexandria and its shareholders so as to benefit all shareholders equally.

46.    Each director and officer of the Company owes to Alexandria and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

47.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Alexandria, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

48.    To discharge their duties, the officers and directors of Alexandria were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

49.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Alexandria, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Alexandria's Board at all relevant times.

50.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

51.     To discharge their duties, the officers and directors of Alexandria were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Alexandria were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Maryland, California, and the United States, and pursuant to Alexandria's own Business Integrity Policy and Procedures for Reporting Non-Compliance (the "Business Integrity Policy");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Alexandria conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Alexandria and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Alexandria's operations would comply with all applicable laws and Alexandria's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the

Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

52.    Each of the Individual Defendants further owed to Alexandria and the shareholders the duty of loyalty requiring that each favor Alexandria's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

53.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Alexandria and were at all times acting within the course and scope of such agency.

54.    Because of their advisory, executive, managerial, directorial, and controlling positions with Alexandria, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

55.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Alexandria.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

56.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

57.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

58.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Alexandria was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

59.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or

substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

60.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Alexandria and was at all times acting within the course and scope of such agency.

## ALEXANDRIA'S BUSINESS INTEGRITY POLICY

61.     Alexandria's Business Integrity Policy states the following regarding its purpose and scope:

> The purposes of this Business Integrity Policy and Procedures for Reporting Non-Compliance (the "Policy") are to ensure that all employees, officers and directors of Alexandria Real Estate Equities, Inc. and its subsidiaries (collectively, "ARE" or the "Company") understand that it is the intent of the Company to comply with all laws and regulations and to transact business in accordance with the highest moral and ethical standards, including the requirements of Section 406 of the Sarbanes-Oxley Act of 2002, and to provide procedures for persons subject to this policy to report instances of non-compliance with this Policy.

> Any violation of this Policy may result in prompt disciplinary action, up to and including termination of employment and, in appropriate cases, civil action or referral for criminal prosecution.

62.     Under the heading "ARE's Business Integrity Principles," in a subsection titled "Conflicts of Interest," the Business Integrity Policy states the following, in relevant part:

> Conflicts of interest are prohibited unless specifically authorized as described below or pursuant to ARE's Personal Investment Policy.  A "conflict of interest" occurs when an individual's private interest interferes with or undermines, or appears to interfere with or undermine, the interests of ARE as a whole.  This can arise when a person subject to this policy takes actions or has interests that make it difficult to perform his or her work objectively and effectively.  Conflicts of interest also include obtaining improper personal benefits, or providing improper personal benefits to others, as a result of a person's position with ARE.  For example, a potential conflict of interest could arise if an employee causes ARE to hire a vendor in which that same employee or his or her relative has a material financial interest.

63.     Under the heading "ARE's Business Integrity Principles," in a subsection titled

"Compliance with Law," the Business Integrity Policy states the following:

> We expect all persons subject to this policy to comply with all laws, rules and regulations, including (without limitation) laws prohibiting fraud, embezzlement, and corruption and all applicable laws in all countries to which they travel, in which we operate and where we otherwise do business. Without limiting the foregoing, persons subject to this policy must comply with the securities laws prohibiting trading on the basis of non-public information.

64.    Under the heading "ARE's Business Integrity Principles," in a subsection titled "Accurate, Fair and Timely Disclosure and Financial Reporting," the Business Integrity Policy states the following:

> All reports that we file with or submit to the Securities and Exchange Commission (the "SEC") must comply with applicable federal securities laws and SEC rules. All persons subject to this policy who are requested to assist or are otherwise involved in preparing any such reports or other communications, including both the collection of information and review of drafts of any such reports or other communications, should (a) do so diligently and in full compliance with ARE's disclosure controls and procedures and (b) take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business conditions of the Company provide full, fair, accurate, timely and understandable disclosure.

65.    Under the heading "Exceptions to Policy," the Business Integrity Policy states the following with regard to waivers:

> Waivers of the specific requirements of this Policy will only be approved in exceptional cases in which it is determined that the requested waiver would not involve a departure from our fundamental commitment to conducting business in compliance with applicable law and the highest ethical standards. Waivers may only be granted by authorized officers or, in the case of any waiver involving an executive officer or director, by the Board of Directors or a duly appointed committee of the Board of Directors. Any waivers of, or amendments or changes to, this Policy involving executive officers or directors of ARE will be disclosed through the filing of a Current Report on Form 8-K or other authorized method in accordance with applicable law and the rules of the New York Stock Exchange.

66.    Under the heading "Reporting of Events of Known or Possible Non-Compliance," the Business Integrity Policy states the following:

> Facts or events that directly or indirectly conflict with the proper application of this

Policy could adversely affect the value and reputation of ARE. Each person subject to this policy shares in the responsibility for ensuring compliance with this Policy.

Should a person subject to this policy become aware of any known or possible instance of noncompliance with this Policy, he or she should promptly report such possible non-compliance to her/his supervisor, local management, the General Counsel or the Chairperson of the Audit Committee. A person subject to this policy must promptly report any complaint he or she may have or receive from any employee, officer or director or any client or other person regarding material accounting, internal accounting controls or auditing matters. Any such reports made will be forwarded to the Audit Committee.

If you believe that the person to whom you have reported material non-compliance with this Policy has not taken appropriate action, you should contact the Audit Committee directly. The email address for the Chairperson of the Audit Committee is rklein@are.com.

Violation of this Policy, and failure to report material non-compliance with this Policy, may be detrimental to ARE and may subject the employee, officer or director to disciplinary action, up to and including termination or removal. In some instances, civil or criminal proceedings may be pursued.

It is most helpful if you identify yourself and provide contact information when reporting any instance of possible non-compliance with this Policy so that ARE may contact you if further information is needed to pursue an investigation. If you are uncomfortable providing your identity, you may also anonymously disclose instances of possible non-compliance with this Policy by submitting your concerns in writing to General Counsel or the Audit Committee c/o Richard H Klein, Chairperson. In either case, any person who discloses instances of possible noncompliance should keep all information related to the matter in strict confidence and not discuss such information with anyone other than ARE officials conducting the investigation or other persons authorized by them, except as required by applicable law.

If you are involved in an event of non-compliance with this Policy, the fact that you voluntarily report such non-compliance in good faith, together with the degree of cooperation displayed by you and whether the non-compliance was intentional or unintentional, will be given appropriate consideration by ARE in its investigation and any resulting disciplinary action.

67.    In violation of the Business Integrity Policy, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the

Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Business Integrity Policy, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Business Integrity Policy.

## ALEXANDRIA'S AUDIT COMMITTEE CHARTER

68.     The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purposes of the Audit Committee are the following:

- The Audit Committee shall be directly responsible for the appointment and compensation of, and oversight over the work of, the Company's independent auditors.

- The Audit Committee shall monitor (1) the integrity of the financial statements of the Company, (2) the Company's compliance with legal and regulatory requirements, (3) the qualifications and independence of the Company's independent auditors, and (4) the performance of the Company's internal audit function and independent auditors.

- The Audit Committee shall prepare the report required by the rules of the Securities and Exchange Commission to be included in the Company's annual proxy statement.

69.     The Audit Committee Charter, under the heading "Committee Authority and Responsibilities," states the following regarding the Audit Committee's responsibility over the Company's quarterly financial statements:

Review and discuss with management and the independent auditors the Company's quarterly financial statements, including disclosures made under "Management's Discussion and Analysis of Financial Condition and Results of Operations" or similar disclosures, and the matters that the independent auditors are required to discuss under the standards of the Public Company Accounting Oversight Board (PCAOB) (United States), or other applicable accounting and auditing

requirements, prior to the filing of its Form 10-Q, including the results of the independent auditors' review of the quarterly financial statements to the extent applicable.

70.     The Audit Committee Charter, under the heading "Committee Authority and Responsibilities," states the following regarding the Audit Committee's responsibility over issues pertaining to the Company's accounting principles and financial statement presentations:

> Review and discuss with management and the independent auditors, as applicable, (a) any significant issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and any significant issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies or the possibility thereof, (b) analyses prepared by management or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP accounting methods or policies on the financial statements, (c) any management letter provided by the independent auditors and any management response to any such letter, (d) the effect of regulatory and accounting initiatives, and of off- balance sheet structures, on the financial statements of the Company, and (e) discuss earnings press releases, including the type and presentation of information to be included in earnings press releases (paying particular attention to any use of "pro forma" or "adjusted" non-GAAP information), as well as any financial information and earnings guidance provided to analysts and rating agencies.

71.     The Audit Committee Charter, under the heading "Committee Authority and Responsibilities," states the following regarding the Audit Committee's responsibility over the Company's risk oversight:

> Discuss with management the Company's significant financial risk exposures (including, without limitation, climate-related and cyber security risk exposures) and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

72.     The Audit Committee Charter, under the heading "Committee Authority and Responsibilities," states the following regarding the Audit Committee's responsibility over the processing of complaints received by the Company pertaining to accounting or auditing matters:

> Establish procedures for (a) the receipt, retention and treatment of complaints

received by the Company regarding accounting, internal accounting controls or auditing matters and (b) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

73.     The Audit Committee Charter, under the heading "Committee Authority and Responsibilities," states the following regarding the Audit Committee's responsibility over the Business Integrity Policy:

> The Audit Committee shall develop and recommend for approval to the Board of Directors the Company's Business Integrity Policy and Procedures for Reporting Non-Compliance, and shall have the responsibility to consider and approve any requests for changes or waivers to or of that policy with respect to directors or executive officers of the Company. The Company shall make disclosure of any such change or waiver as required by the New York Stock Exchange and the Securities and Exchange Commission.

74.     In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, ensure that the Company's financial states complied with GAAP, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

75.     Alexandria is a real estate focused Maryland corporation, with its principal

offices located in Pasadena, California. The Company's operations generally consist of the acquisition, development, and leasing of life science-based properties and locations.

76.     The Company has elected to be taxed as a real estate investment trust ("REIT") for federal income tax purposes. Additionally, as of December 31, 2025, the Company had a total market capitalization of $20.8 billion. Moreover, as of December 31, 2025, the Company possessed an asset base in North America consisting of 35.9 million rentable square feet ("RSF") of operating properties. As of December 31, 2025, the Company also had 3.5 million RSF of Class A/A+ properties undergoing construction in North America.

77.     The Company's overarching business plan is to acquire properties located in "Megacampus" ecosystems, through which various life science businesses and institutions cluster in geographic areas. The Company's stated purpose of its Megacampus strategy is to provide optionality and scalability to tenants, promote collaborative development, and help tenants retain talent. The Company's goals are aided by the fact that such Megacampus ecosystems are proximate to major academic and medical research institutions. Moreover, the Company's Megacampus strategy seeks to provide curated amenities and convenient access to transportation.

78.     As noted above, to accomplish the Megacampus strategy, the Company prioritizes Class A/A+ properties located in Megacampus ecosystems. As of December 31, 2025, the Company's operating segments consisted of the following geographic markets: New York City, Texas, Maryland, Seattle, San Diego, the San Franciso Bay Area, and the Greater Boston Area.

79.     In addition to the acquisition and leasing of properties located in Megacampus ecosystems, Alexandria also develops some properties it acquires for further leasing in the life science industry. Notably, the Company redevelops acquired office, warehouse, or shell space to

lease as reusable laboratory space.

80.     One notable property formerly owned by the Company which did not fall under the Megacampus category is the LIC Property. The LIC Property is roughly 179,100 RSF, and according to the Company, is not located in a core location within the New York City market. In December 2025, the Company sold the LIC Property for $24.5 million, with no gain or loss recognized on the sale.

**<u>False and Misleading Statements</u>**

***January 27, 2025 Press Release***

81.     The Relevant Period began on January 27, 2025, when the Company issued a press release to announce its financial results for the fourth quarter of 2024 (the "Q4 2024 Press Release"). The Q4 2024 Press Release highlighted the Company's "continued solid leasing volume" and "1.3 million RSF (rentable square feet) for 4Q24, up 19% compared to our previous five-quarter average."

82.     The Q4 2024 Press Release also reported on the Company's occupancy rates in North America and leasing volume, stating the following, in relevant part:

<u>*Continued solid leasing volume and rental rate increases*</u>

• Continued solid leasing volume

     • 1.3 million RSF for 4Q24, up 19% compared to our previous five-quarter average.

     • Fourth consecutive quarter with leasing volume exceeding 1 million RSF.

     • 5.1 million RSF for 2024, up 19% compared to our 2014–2020 average of 4.3 million RSF.

• Rental rate increases on lease renewals and re-leasing of space were 18.1% and 3.3% (cash basis) for 4Q24 and 16.9% and 7.2% (cash basis) for 2024.

• 84% of our leasing activity during the last twelve months was generated from our existing tenant base.

• Tenant improvements and leasing commissions on renewed and re-leased space executed during the year ended December 31, 2024 represented only 8.4% of total lease term rents, the second lowest percentage of total lease term rents in the past five years.

(Emphasis in original).

### *January 28, 2025 Earnings Call*

83.     On January 28, 2025, the Company hosted the Q4 2024 Earnings Call.

84.     During the Q4 2024 Earnings Call, Defendant Moglia discussed the Company's

development pipeline and leasing supply, stating the following, in relevant part:

In the fourth quarter, we delivered 602,593 square feet into our high barrier to entry submarkets, bringing total deliveries for the year to 2,457,963 square feet covering 13 projects. The annual incremental NOI delivered during the year was approximately $118 million, including $55 million in the fourth quarter. *Another $395 million is expected to deliver beginning in 2025 through the second quarter of 2028. The initial weighted average stabilized yield for 2024 deliveries was 6.7%, supported by a solid stabilized yield on cost of 7.1% from our fourth quarter delivery.*

\* \* \*

*Alexandria's pipeline is well positioned to capture future demand when expansion needs arise. Our dominant existing tenant base allows us to get in front of many requirements before they reach the market, and our location, scale and sponsorship matter a lot to tenants as we statistically illustrated at Investor Day.*

85.     Also during the Q4 2024 Earnings Call, Defendant Binda stated the following

about the Company's growth potential and expectations for 2025, in relevant part:

*On internal growth, our solid operating results for the quarter continue to be driven by our disciplined execution of our megacampus strategy, tremendous scale advantage, long-standing tenant relationships and operational excellence by our team. 77% of our annual rental revenue comes from our collaborative megacampuses, and we hope to increase this steadily over time. We have high-quality cash flows with 52% of our annual rental revenue from investment-grade and publicly traded large-cap tenants.*

\* \* \*

31

*On leasing, an important takeaway for the quarter is the continued solid leasing volume driving our business. Leasing volume for the quarter was 1.3 million square feet, which represents the fourth consecutive quarter over 1 million square feet and creates great momentum as we transition into the new year*.

\* \* \*

*Leasing volume for the full year '24 was 5.1 million square feet, up 17% over the prior year and up 19% compared to the 7-year historical period prior to 2020. We continue to benefit from our tremendous scale, high-quality tenant roster and brand loyalty with 84% of our leasing activity over the last 12 months coming from our existing deep well of approximately 800 tenant relationships*.

\* \* \*

*Our outlook for full year '25 same-property growth is consistent with our prior outlook at down 2% and flat on a cash basis at the midpoint. These projected results for 2025 include the impact of approximately 2.6% and 3.4% on a cash basis from the $768,000 of lease expirations expected to go vacant in 1Q '25 spread across 4 projects*. As a reminder, the 2 largest components of those key 1Q '25 lease expirations relate to Alexandria Technology Square with a move-out and expansion to another Alexandria property by Moderna and our single-tenant building at 409 Illinois in Mission Bay.

\* \* \*

*Turning to occupancy. Occupancy for the quarter was solid at 94.6%, which is consistent with the steady results over the last 5 quarters. The midpoint of our guidance range for occupancy for year- end '25 is 92.4%, which includes approximately 2% vacancy coming from the 4 projects, with 1Q '25 lease expirations expected to go vacant that I described earlier and are described on Page 24 of our supplemental package*.

\* \* \*

*Turning to guidance. We reaffirmed our guidance for 2025 with $150 million change to our '25 sources of capital to reflect the closing of certain dispositions that were originally expected to close in 2024 and are now expected to close in 2025. There were no changes to the midpoints of our guidance ranges for EPS of $2.67 and FFO per share diluted as adjusted of $9.33*.

\* \* \*

*In closing, as we reflect on the fourth quarter and the full year of 2024, we're pleased with the tremendous execution with solid FFO growth of 5.6% in a very*

*tough macroeconomic environment. With our tremendous scale, high-quality cash flows, deep industry relationships and our highly experienced management team, we're well positioned to continue reinforcing our dominant platform and strategically position us for future growth*.

86.     Later on during the Q4 2024 Earnings Call, the Individual Defendants engaged in a question-and-answer segment with investors and analysts. The Individual Defendants continued to express confidence in the Company's leasing volumes, as evidenced by the following pertinent discussions:

<Q: Wesley Keith Golladay– Robert W. Baird & Co., Research Division - Analyst> I just want to go back to that comment about just-in-time leasing. What does that mean for your 2026 developments? Would that be more back half leasing this year? Would it be all the way until next year that we see leasing there?

<A: Defendant Moglia > Yes. Certainly, things that are delivering in 2026 are just not top of mind for folks that are deciding they need space and then go out to the market and identify things within 60 to 90 days…*But we certainly do have our existing tenant base that just loves our platform, loves our operations and has been very loyal. So we certainly do see ourselves getting things done in 2026. I think I mentioned we're 70% leased or under negotiations, which means we have signed LOIs for 70% of that space. So the other 30% will likely come from our existing tenant base or potentially some new tenants, but those are in pretty good shape. It's getting into '27 where we're still too far out for folks thinking. So we're going to do our best to generate some more activity there, but the market is really just looking at things that they can get into in a very short time or a relatively short time frame. But the '25 and the '26 deliveries are in pretty good shape*.

* * *

<Q: Vikram L. Malhotra–Mizuho Securities, Research Division - Analyst > I guess, Joel, just bigger picture, leasing velocity is sort of critical now given sort of deliveries hopefully coming in towards the back half, but critical for the industry, critical for the ARE story as well. Can you just -- I know you don't want to comment on 1Q, but just even bigger picture, how do you anticipate leasing inflecting? Any numbers you can share like tenants in the market or even just how the pipeline has changed Q-over-Q? Just feels like that's a critical piece. And I'm wondering if you can just share some statistics how '25 could evolve versus '24.

<A: Defendant Marcus > Yes. I think that's the kind of question that I'd really prefer to leave for first quarter when we can give you, I think, more granularity that we feel comfortable with. *Remember that the bulk of our tenants in the variety of sectors we service under the life science industry as a whole that Hallie mentioned*

*come from our own tenant base. So we have a really, really good picture, over 800 tenants of each and every market and what the demand is, quite apart from what people that the brokers may represent or what they see*. They often don't see much of what we see. And oftentimes, we may sign leases or LOIs where brokers simply aren't aware of those things. So I don't really want to get into first quarter. I want to kind of get into the details there. So I'd ask you just to be patient and bear with us. *But I think we're going to have some pretty good news*.

<Q: Vikram L. Malhotra–Mizuho Securities, Research Division - Analyst > And then just sorry, last one, if I can clarify, you mentioned you feel pretty good about the lease-up of the developments into '25, '26. Maybe '27, the question starts. But would there be factors that cause you to pause any of the developments in either '25 or '26, push it out into '27, say?

<A: Defendant Marcus > No. *I think what Marc published in the press -- the supp and press release is our best guess of how we think our allocation of capital should match the demand we're seeing. So I don't expect any material changes certainly to '25 or '26 post this print*.

### April 2, 2025 Proxy Statement

87.    On April 2, 2025, the Company filed the 2025 Proxy Statement with the SEC. Defendants Marcus, Aldridge, Cain, Freire, Hash, Klein, McGrath, and Woronoff solicited the 2025 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

88.    The 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Marcus, Aldridge, Cain, Freire, Hash, Klein, McGrath, and Woronoff to the Board until the next annual meeting of stockholders; (2) approve the amendment and restatement of the Amended and Restated 1997 Stock Award and Incentive Plan (the "2025 Amendment to the 1997 Plan"); (3) approve, on advisory basis, the compensation of the Company's named executive officers; and (4) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accountants for the fiscal year ending December 31, 2025.

89.    The 2025 Proxy Statement states that the 2025 Amendment to the 1997 Plan

would, *inter alia*: increase the aggregate number of shares of common stock available for grant by 850,000 shares and extend the termination date of the 1997 Plan to ten years from the date of stockholder approval of the 1997 Plan. The 2025 Proxy Statement states that as of March 31, 2025, 3,9565,506 shares of common stock were still available for grant, meaning that if the 2025 Amendment to the 1997 Plan is approved, the Company will have approximately 4.8 million shares available for grant. The 2025 Proxy Statement states that if the 2025 Amendment to the 1997 Plan is not approved, the Company's incentive plan would continue to be administered in its current form.

90.     Regarding the role of the "Board of Directors and Leadership Oversight," the 2025 Proxy Statement stated the following, in relevant part:

> Alexandria is committed to conducting our business in accordance with high standards of corporate governance, transparency, integrity, and accountability, led by an independent and objective Board. The Board has overall responsibility for oversight of the Company's risk management. This oversight is carried out both directly by the Board and through its committees.
>
> As provided in the Audit Committee Charter, the Audit Committee of the Board oversees the management of the Company's financial and other risks, including climate-related risks. At a management level, Alexandria's sustainability committee, which comprises members of the executive team and senior decision makers spanning the Company's real estate development, asset management, risk management, and sustainability teams, leads the development and execution of our approach to climate-related risk.

91.     Regarding the Business Integrity Policy, the 2025 Proxy Statement stated the following, in relevant part:

> The Company has a Business Integrity Policy that applies to all directors, officers, and employees and is intended, among other things, to comply with Section 406 of the Sarbanes-Oxley Act of 2002 and related SEC rules and the New York Stock Exchange (the "NYSE") listing standards requiring a code of ethics for a company's directors, officers, and employees. A copy of the Company's Business Integrity Policy is available at https://investor.are.com/corporate-governance/disclosure. The Company intends to report any amendment to, or waiver from, the Business Integrity Policy, which applies to any director or

executive officer, by posting such information on our corporate website in accordance with applicable rules of the SEC and listing standards of the NYSE.

92.    The 2025 Proxy Statement was materially false and misleading because it failed to disclose, *inter alia*, that: (1) the Company's properties were experiencing lower occupancy rates and slower leasing activity; (2) the Company faced substantial real estate impairment charges with the majority of such charges being attributed to the Company's LIC Property; (3) as a result of the lower occupancy rates, declining leasing activity, and real estate impairment charges, the Company would have to slash its FFO guidance for the full 2025 year; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

93.    The 2025 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Business Integrity Policy was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Business Integrity Policy. Further, the 2025 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

94.    As a result of Defendants Marcus, Aldridge, Cain, Freire, Hash, Klein, McGrath, and Woronoff causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Marcus, Aldridge, Cain, Freire, Hash, Klein, McGrath, and Woronoff to the Board until the next annual meeting of stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve the 2025 Amendment to the 1997 Plan; (3) approve, on advisory basis, the compensation of the Company's named executive officers; and (4) ratify the appointment of Ernst & Young LLP as the Company's

independent registered public accountants for the fiscal year ending December 31, 2025.

### *April 28, 2025 Press Release*

95.     On April 28, 2025, the Company issued a press release to announce its financial results for the first quarter of 2025 (the "Q1 2025 Press Release"). The Q1 2025 Press Release noted "continued solid leasing volume of 1.0 million RSF during 1Q25, the fifth consecutive quarter with leasing volume exceeding 1 million RSF."

96.     The Q1 2025 Press Release also discussed the Company's development pipeline and significant progress regarding leasing, stating the following, in relevant part:

*Alexandria's development and redevelopment pipeline delivered incremental annual net operating income of $37 million commencing during 1Q25, with an additional $171 million of incremental annual net operating income anticipated to deliver by 4Q26*

• During 1Q25, we placed into service development and redevelopment projects aggregating 309,494 RSF that are 100% leased across multiple submarkets and delivered incremental annual net operating income of $37 million. A significant 1Q25 delivery was 285,346 RSF at 230 Harriet Tubman Way located at the Alexandria Center® for Life Science – Millbrae in our South San Francisco submarket.

• Our active development and redevelopment projects under construction, primarily related to our Megacampus ecosystems, have an estimated $2.4 billion of remaining costs to complete, of which $1.3 billion is not under contract as of March 31, 2025. Additionally, we estimate that 30%–40% of the costs not under contract represent costs for materials that may be subject to inflationary pressure and/or potential tariffs. As such, we estimate that each 10% increase in these costs for materials may result in incremental costs aggregating $40–$50 million and a corresponding decline in initial stabilized yields of approximately 2.5 to 3.5 basis points for our existing active development and redevelopment projects. This estimate does not account for the cost of potential delays that may occur in receiving or replacing materials subject to tariffs.

• Annual increase by $61 million by 4Q25 upon the burn-off of initial free rent, which have a weighted average burn-off period of approximately four months.

• 71% of the RSF in our total development and redevelopment pipeline is within our Megacampus ecosystems.

(Emphasis in original).

### April 29, 2025 Earnings Call

97.     On April 29, 2025, the Company hosted an earnings call to discuss its financial

results for the first quarter of 2025 with investors and analysts (the "Q1 2025 Earnings Call").

98.     During the Q1 2025 Earnings Call, Defendant Moglia stated the following, in

relevant part:

> *Turning to the impact of tariffs on our active development and redevelopment pipeline. Spoiler alert, they are not expected to have a material influence on our yields*.
>
> * * *
>
> *Transitioning to leasing and supply. Alexandria's superior quality, location, scale and sponsorship enabled the leasing of 1,030,553 square feet in the first quarter at solid rental rate increases for renewed and released space of 18.5% and 7.5% on a cash basis, and the weighted average lease term was very strong at 10.1 years*. This is the fifth straight quarter where we've exceeded 1 million square feet of leasing. And despite elevated concessions, net effective rents on re-leasing and renewal space remain positive. *We have a solid list of prospects for our development and redevelopment projects, but activity for this leasing segment, which is typically driven by expansion requirements, remains muted for the moment due to continuing conservatism from life science company management teams and boards*.
>
> * * *
>
> *Here are the takeaways. We continue to deliver transformative projects and incremental NOI from our pipeline. Tariffs will not create material dilution to our current pipeline projects*. We continue to execute solid leasing, competitive supply deliveries are winding down, and we're making good progress on our asset harvesting and recycling program.

99.     Also during the Q1 2025 Earnings Call, Defendant Binda asserted that the

Company's leasing volumes and growth in FFO per share diluted as adjusted through 2025

remained strong, stating the following, in relevant part:

> *As Peter highlighted, our leasing volume continues to be solid with over 1 million square feet leased during the quarter and represents the fifth consecutive quarter over 1 million square feet. We continue to benefit from our tremendous scale,*

*high-quality tenant roster and brand loyalty with 89% of our leasing activity in the quarter coming from our existing deep well of approximately 750 tenant relationships*. We also continue to dominate in our core submarkets, getting more of the deals in many of our submarkets than the next several landlords combined. Rental rate growth for lease renewals and re-leasing of space for the quarter was a solid 18.5% and 7.5% on a cash basis, which is at or above the high end of our guidance ranges for the year. We continue to achieve very healthy lease terms on completed leases with 10 years on average for the quarter, which is above our historical 10-year average.

* * *

*Overall, for the full 2.9% reduction in occupancy, we're making very good progress on resolving these with about 1/4 of this amount leased with a future delivery date around the end of this year*.

* * *

The details of our guidance are included on Page 4 of our supplemental package. Our guidance for FFO per share diluted as adjusted was reduced by $0.07 to a midpoint of $9.26, which puts the revised midpoint at the low end of our initial range for FFO per share results and represents a change of 75 basis points from our initial guidance. *Even with this change, our estimate for 5-year growth in FFO per share diluted as adjusted through 2025 is 27%, which puts us near the top end of the range among the peers in the 15 NAREIT Equity Healthcare REIT Index*.

100.    Later on during the Q1 2025 Earnings Call, the Individual Defendants conducted a question-and-answer segment with investors and analysts. The Individual Defendants continued to assert the Company's financial success and growth prospects, as evidenced by the following exchanges, in relevant part:

<Q: Farrell Granath – Bank of America Securities, Research Division – Analyst> I was wondering if you can walk us through with the new guidance, does this encompass a worst-case scenario, especially in terms of what could happen in the biotech market, specifically with capital raising? Or within the range, is there a worst case and best case scenario baked in?

Specifically when it comes to leasing going forward when it comes to the demand and specifically if there's continued cuts when it comes to NIH funding or even further reduction.

< A: Defendant Binda > Yes. Look, I think the estimate we put out there is our best

estimate with the facts that we know today. So it's not the best case, and it's not the worst case. It's really our estimate with the facts that we know today.

\* \* \*

<Q: Anthony Paolone - JPMorgan Chase & Co, Research Division – Senior Analyst > Joel, last quarter, you talked about, I think, a couple of pockets of demand maybe starting to emerge, and you were pretty optimistic about some messaging you might have on the first quarter call based on what you were seeing then. I mean do you feel like that emerged? Or did things just change quite a bit in the last few months?

<A: Defendant Marcus> *I would say that they haven't changed and stay tuned. I think we continue to see, and Hallie did a good job of describing the multifaceted demand that we're seeing given the more muted environment we're in, in the pie chart we put out there this time. But I think over the coming few weeks or month or 2, I think we'll have some things that will be viewed as very positive. It's just time just it just takes time to do that, but nothing is changing for the negative.*

\* \* \*

<Q: Peter Dylan Abramowitz - Jefferies LLC, Research Division– Equity Analyst> Just wondering, as you have conversations internally, especially, I guess, as it relates to the change in the guidance, certainly, you've outperformed a lot of your markets in terms of occupancy loss. But just curious, your internal conversations, do you have a sense of where you think occupancy could bottom in the portfolio, the time line for how that could happen and then kind of what you would need to see to start to see an inflection?

<A: Defendant Binda > Yes. *We definitely look space by space. I mean I do think that we had a large amount of expirations that came proportionately in the first quarter here, Peter. So I do think that, that was a little unusual that it was that large in a particular quarter. And of course, we knew that we had a couple of big suites coming back to us that will require some time.* The couple of projects in that $768,000 many of those -- most of those will take some time to release. So those -- we're not expecting that at least that 768,000 that much of any of that will be delivered this year.

### *July 21, 2025 Press Release*

101.    On July 21, 2025, the Company issued a press release to announce its financial results for the second quarter of 2025 (the "Q2 2025 Press Release"). The Q2 2025 Press Release noted that adjusted FFO and total revenue exceeded consensus estimates.

102.    The Q2 2025 Press Release also stated that the Company was maintaining its full

year FFO guidance, stating the following, in relevant part:

*Leasing volume and rental rate increases*

• Leasing volume of 769,815 RSF during 2Q25.

• In July 2025, we executed the largest life science lease in company history with a longstanding for a 16-year expansion build-to-suit lease, aggregating 466,598 RSF, located on the Campus Point by Alexandria Megacampus in our University Town Center submarket. If this were included in the leasing volume for 2Q25, the total leased RSF would have increased to 1.2 million RSF for 2Q25 from 769,815 RSF. Refer to "Subsequent events" in the Earnings Press Release for additional details.

• Rental rate increases on lease renewals and re-leasing of space of 5.5% and 6.1% (cash basis) for 2Q25 and 13.2% and 6.9% (cash basis) for 1H25.

• 84% of our leasing activity during the last twelve months was generated from our existing tenant base.

(Emphasis in original).

### July 22, 2025 Earnings Call

103.    On July 22, 2025, the Company hosted an earnings call to discuss its financial results for the second quarter of 2025 with investors and analysts (the "Q2 2025 Earnings Call").

104.    During the Q2 2025 Earnings Call, the Individual Defendants noted a slight decrease in occupancy rates but continued to assert "prior guidance for year-end 2025 occupancy at 90.9% to 92.5%" in addition to support for the Company's development pipeline and ability to maintain the Company divided at its current level.

105.    Moreover, during the Q2 2025 Earnings Call, Defendant Binda stated the following, in relevant part:

*Occupancy at the end of the quarter was at 90.8%, which was down 90 basis points from the prior quarter. With 75% of our annual rental revenue coming from our highly distinguished Megacampus platform, we continue to outperform the rest of the market on occupancy in our biggest 3 markets.*

*We are reiterating our prior guidance for year-end 2025 occupancy at 90.9% to 92.5%. An important note about our occupancy guidance is that we have 669,000*

*square feet or about 1.7% occupancy of least but not yet delivered space, which will positively impact our occupancy in early 2026 on average upon delivery. In addition, our year-end occupancy guidance assumes around a 2% benefit from assets with vacancy, which are expected to be sold of which about 1/3 of that is subject to a signed purchase and sale agreement.*

\* \* \*

*Next on the development pipeline. With projects under construction and expected to generate significant NOI over the next few years and other earlier-stage projects undergoing important entitlement, design and site work necessary to be ready for future ground-up development, we are required to capitalize a portion of our gross interest cost….We remain focused on continuing these important preconstruction activities for our future pipeline where it makes good financial sense to continue.*

\* \* \*

For the second quarter, our Board elected to maintain the dividend at its current level of $1.32 per quarter or a dividend yield of 7.3% as of quarter end. Turning next to guidance. *We are holding firm on our guidance for FFO per share diluted for '25 at $9.26 per share at the midpoint of our guidance range.*

106.    Also during the Q2 2025 Earnings Call, Defendant Moglia stated the following

regarding the Company's leasing spreads and development pipeline, in relevant part:

*In the second quarter, we leased approximately 770,000 square feet with leasing spreads of 5.5% and 6.1% on a cash basis. We were very pleased that tenant improvements and leasing commissions on renewals were down 40% compared to previous 2 quarters and although free rent was elevated, it enabled us to secure a relatively high average duration of 9.4 years. The lease duration was also healthy for developed and redeveloped and previously vacant space at 12.3 years. One key result of the quarter we'd like to highlight is that our focused effort on development and redevelopment leasing has started to gain traction.*

107.    Later on during the Q2 2025 Earnings Call, the Individual Defendants conducted

a question-and-answer segment with investors and analysts. The Individual Defendants continued

to assert the Company's growth in leasing volume in the face of occupancy headwinds, stating the

following, in relevant part, during the following exchanges:

<Q: Anthony Paolone JPMorgan Chase & Co, Research Division – Senior Analyst>
First question is I just wanted to follow up on some of the occupancy comments

42

you made. And so I guess, if I'm understanding the dispositions, right, if we were to put those aside and think about sort of the remaining portfolio over the course of the year. Did you mention that occupancy will be down 2% then in the second half, like kind of if you ignore sort of the dispositions?

<A: Defendant Binda > Yes. ***Tony, in terms of kind of the bridge to year-end occupancy were at 90.8% today, so kind of right at the -- or just below the bottom end of our range. We're expecting a pickup in occupancy given as Peter said, a big chunk of the assets that we've identified for sale are non-stabilized, so they have some vacancy. So we're expecting some pickup as those assets get sold and then you've got the normal kind of leasing to do on the back half of the year.*** So you put all those pieces together, that's how we get to our year-end number.

<Q: Anthony Paolone JPMorgan Chase & Co, Research Division – Senior Analyst> And then -- because then you mentioned you also have a bunch of signed but not yet commenced stuff that sounds like that kind of picks up a couple of points early next year? And I guess where I was going with that is you also added this disclosure around the 2026 expirations and it seems like there's a couple of points that might come out early next year there as well. And so just trying to get the next few quarters kind of understand the trajectory and because you laid out a lot of good pieces.

<A: Defendant Binda > Yes. There's a lot of moving pieces. ***We've got the 600-and-change or the 1.7% benefit to occupancy. And then we've also got some work to do on some of these '26 expirations. A little too early to give you a clear guidance in terms of what downtime looks like on that as we're really still working through the business plans and the re-leasing strategy on those things***.

<Q: Vikram L. Malhotra Mizuho Securities USA LLC, Research Division – Senior Analyst> And then just second one, I guess, you laid out a part about occupancy headwinds near term. But maybe if we can step back, can you give us a sense of how you see this playing out call it, over the next 18 months. So when are we going to trough for ARE specifically? And maybe if you can embellish that a little bit of like how strong is the potential build-to-suit pipeline for you guys?

<A: Defendant Binda > Yes. I would just refer you, Vikram, to the discussion we had with Tony earlier in the call, where we held our occupancy guidance where it was at. we're right just below the low end of the guidance range right now at 90.8%. ***We've got a good head start in terms of what that looks like for next year with the space that's leased that is going to be delivering. But at the same time, we've got the lease rolls that we highlighted that we need to deal with as well, and we'll have kind of more to come on those as we flesh out the re-leasing strategies, hopefully, in the coming quarters.***

108.    The statements in ¶¶81-86 and ¶¶95-107 above were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the Company's properties were

experiencing lower occupancy rates and slower leasing activity; (2) the Company faced substantial real estate impairment charges with the majority of such charges being attributed to the Company's LIC Property; (3) as a result of the lower occupancy rates, declining leasing activity, and real estate impairment charges, the Company would have to slash its FFO guidance for the full 2025 year; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

## **THE TRUTH EMERGES**

### *October 27, 2025 Press Release*

109.    The truth began to emerge on October 27, 2025, when the Company issued the Q3 2025 Press Release. The Q3 2025 Press Release reported underwhelming results for 2025 and notably slashed its FFO guidance for the full-year 2025. The Q3 2025 Press Release further noted slower leading activity, lower occupancy rates, and a real estate impairment charge of $323.9 million.

110.    Moreover, $206 million of the real estate impairment charge derived from the Company's LIC property, with the Q3 2025 Press Release stating the following, in relevant part:

Key changes to our 2025 guidance include the following:

1) The midpoint of our guidance range for 2025 net (loss) income per share was reduced by $3.44 from $0.50 to $(2.94). In addition to the items discussed in item 2 below, the update to our guidance range for 2025 net (loss) income per share includes the following:

• Potential additional impairments of real estate (including impairments on stabilized and non-stabilized properties and land) that may be recognized in 4Q25 ranging from $0 to $685 million, related to assets that could potentially be sold in 4Q25 or 2026 2026, and if such assets meet the held for sale criteria in 4Q25, considering market factors, buyer ability to perform, our desire to proceed with a sale at a particular price, and other factors.

• Potential additional gain on sales of real estate that may be recognized in 4Q25 ranging from $0 to $240 million related to assets that may be sold in 4Q25.

• These potential impairments and gains on sales of real estate will not impact our funds from operations per share pursuant to the Nareit definition of funds from operations.

### October 28, 2025 Earnings Call

111.    The truth continued to emerge on October 28, 2025, when the Company hosted the Q3 2025 Earnings Call.

112.    During the Q3 2025 Earnings Call, Defendant Binda discussed the Company's setbacks, in particular the real estate impairment charge pertaining to the Company's LIC property. More specifically, Defendant Binda stated the following, in relevant part:

> ***Our team continues to navigate a challenging environment given macro industry and policy factors beyond our control***. Please refer to our earnings release for our EPS results. FFO per share diluted as adjusted was $2.22 for 3Q '25 and included the following three key impacts compared with the prior quarter.
>
> * * *
>
> ***We've completed $508 million of dispositions to date, which leaves $1 billion to complete in the fourth quarter, all of which are subject to non-fundable deposits, signed LOIs or purchase and sale negotiations. In connection with our disposition program, we recognized impairments of real estate of $323.9 million during the quarter, with approximately 2/3 of that coming from an investment in our Long Island City redevelopment property***.
>
> Three items to highlight here. First, we acquired the site in 2018. That submarket suffered a substantial setback when Amazon abandoned its plan for new HQ in that location in 2019 and it never recovered. Second, despite the lower rental rate price point and our dominance in that submarket, it has been challenging to get a critical mass of life science tenants to go to this location. ***And ultimately, we don't view it as a life science destination that can scale. And third, this location has become more of an industrial flex and cinema submarket rather than life science***.
>
> Ultimately, at the end of September, we decided future capital needs and the sale proceeds related to this project would be better recycled into our Megacampuses where we have greater conviction long term. ***Looking forward, we have a number of assets under consideration for sale either by the end of this year or sometime in 2026 that have estimated values below our carrying values ranging from $0 to***

***$685 million. Although these potential impairments have not been triggered and final decisions to proceed have not been made, we updated our guidance range for 2025 to reflect these potential additional impairments in the fourth quarter.*** We anticipate an end to the large-scale non-core asset program by the end of 2026 or early 2027. We also expect dispositions to provide the vast majority of our capital needs for next year.

* * *

***We provided updated guidance for FFO per share diluted as adjusted for 2025, which was reduced by $0.25, or about 2.7%, to a midpoint of $9.01 per share.*** This change was primarily due to lower investment gains and lower same-property performance driven by lower occupancy.

113.    Later on during the Q3 2025 Earnings Call, the Individual Defendants conducted a question-and-answer segment with investors and analysts. During the segment, the Individual Defendants discussed the implications of the Company's setbacks on its recent tenant activity and near future potential demand for its real estate assets, captured, in relevant part, during the following exchange:

<Q: Farrell Granath - BofA Securities – Analyst> I first just want to touch on -- I know last quarter, you had some commentary about potential benefits to occupancy, about 600,000 or 1.7%. I was curious on the update and your expectations or line of sight that you're seeing now?

<A: Defendant Binda> …It's primarily at properties located in Greater Boston, San Francisco, San Diego and Seattle. ***And it's about $46 million of -- potential annual rental revenue of $46 million. And we expect it to deliver on average. There's a lot of spaces in there, as you can imagine, but on average, around May 1 of next year.***

<Q: Farrell Granath - BofA Securities – Analyst> And also, I guess, a broader question. In previous calls, we've heard that there was early positivity around leading indicators in the biotech market. And you made a few comments around that. But it generally still feels like you're very much seeing the impacts of supply and demand. And I'm curious, what would turn your perspective or optimism a little bit higher, either if that's greater IPOs or different capital market movements?

<A: Defendant Marcus> Yes. That's also a really important question. I think the two -- well, there are three missing links, as I mentioned in my opening comments, to demand today, and Hallie can give you chapter and verse on the green shoots that we're seeing, which are substantial from the capital market side to M&A, et

cetera. *But one is the FDA -- the government shutdown has to stop and the FDA has to open. Number two, venture -- earlier-stage venture-backed companies have to start making commitments for space as opposed to kind of holding, waiting for cost of capital issues with the fed and broadly in the industry.*

*And I think, three, the public biotech sector, which has been, to a large extent, the mainstay of this industry as far as space and demand has to be reignited.* And even though the XBI is up substantially, that has not yet translated into action. So I think those are the key things we're looking for.

*And institutional demand, if the NIH can get its act together on the issues we talked about, one, making sure they're fully funded and disbursing funds and that there's an unlocking of the current bar to the 15% [ indirect ] cost limitation.*

* * *

<Q: Wesley Keith Golladay Robert W. Baird & Co. – Senior Research Analyst> I was just looking at the future pipeline, the $3 billion and the $1.2 billion, how much of the potential residential land plays will come out of that bucket? And then when you also look at the potential for $685 million of impairments, would that mostly fall in that bucket as well?

<A: Defendant Binda> …*Just to be clear, the $685 million is -- relates to a variety of assets that are under consideration. So there's a variety of ways that, that could go. It just depends on what happens with the buyer, if we can get a price that we like, et cetera, some of these assets we could end up holding if we decide to pivot. But the $685 million, I would say the bigger chunk there has to do with land-type assets.*

<Q: Wesley Keith Golladay Robert W. Baird & Co. – Senior Research Analyst> And then for the leases that are going to commence in, I guess, the first half of next year, was there any -- it looks like there might have been a small delay on that. Was that anything like permitting-wise or just the tenant looking to move in a little bit later?

<A: Defendant Binda> Yes. No, I don't know that there was necessarily a delay. It's just a -- that bucket continues to evolve, right, as some of it gets delivered and then we're obviously adding new stuff there, right? We're leasing space that then extends that. So that will be an evolution just because that bucket changes from quarter-to-quarter.

* * *

<Q: Michael Albert Carroll - RBC Capital Markets, Research Division – Head of US Real Estate Research > Can you provide some color on the type of tenant activity that the company is tracking right now? I mean it sounds like in the

prepared remarks that you're seeing activity being kind of flat despite the XBI uptick. But are there certain tenants looking for different types of spaces? I mean, how many tenants are looking for like the Class A space versus the Class B space? I mean is there different price points that tenants are looking at just given them trying to extend their cash burn rates given the current uncertainty?

<A: Defendant Marcus> *Well, yes, that's almost an impossible question to answer because if you look at the press release and supp, we put a pie chart of our -- the tenant sectors in there, and there is certainly demand from almost all of those. There's no government demand. And at the moment, there's muted institutional demand, although we're working on one big deal as we speak.* But aside from that, I think what we said is, and it varies submarket by submarket, each submarket has its own particular dynamics. Some are pretty well in balance with supply and demand, others are imbalanced. And so that is a little bit different. But I think across the board, there is demand.

*I think what the commentary really is, is that given the recovery in the XBI, we're a little surprised that demand hasn't followed as much.* It's not as obvious than maybe in past times, but the reason for that is clear, cost of capital and federal interest rates are being stubbornly high. The government has shut down. The FDA is closed by and large, and there's a lot of logjams out there that are preventing company -- and the IPO market is shut by and large. There's a little bit of activity, but it really isn't an opening. I think those are the factors.

*But there's demand from a variety of sectors. But again, it's very case specific. And it also depends on, when you say Class A, you tend to have revenue-producing companies looking for Class A space or companies that are extremely well-capitalized.* Others are looking for either moved out space or second -- true second-generation space after a 5-, 7-, 10-year lease, so it varies all over the marketplace.

114.    On this news, the price per share of the Company's common stock fell $14.93, or roughly 19.2%, from a closing price of $77.87 per share on October 27, 2025 to close at $62.94 per share on October 28, 2025.

## SUBSEQUENT DEVELOPMENTS

*October 29, 2025 Form 8-K*

115.    On October 29, 2025, the Company filed a current report on Form 8-K with the SEC, which stated the following, in relevant part:

Based on our current view of market conditions and in consideration of the factors

48

included in the "Summary of Key Items that May Impact 2026 Results" section of our most recent quarterly report on Form 10-Q, as reiterated below, we expect the midpoint of our range for funds from operations per share – diluted, as adjusted for the year ending December 31, 2026 to be within the range of $6.25 to $6.85.

116.    Notably, several major analysts reacted negatively to the Company's disclosures, lowering their price targets for Alexandria. For instance, an analyst from Evercore ISI stated the following regarding the Company's Q3 2025 Press Release and October 29, 2025 Form 8-K, in relevant part:

> In retrospect, we were too optimistic regarding the turn in life science fundamentals and capital markets backdrop, that influenced our modeling heading into Q3. In addition, we underestimated the duration and degree of the operating headwinds (known tenant vacates, limited additional leasing in the dev/redev pipelines, capital recycling timeframes, etc.) that ARE continues to confront.

117.    Likewise, an analyst with J.P. Morgan stated that "…ARE [the Company] is in the midst of a 'reset' with regards to selling non-core asses and making its way through a difficult patch of weak demand for life science real estate and also heavy supply."

## REPURCHASES DURING THE RELEVANT PERIOD

118.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of ***approximately $58.2 million*** to repurchase 610,319 of its own common stock at artificially inflated prices between February 2025 and October 2025.

119.    According to a Form 10-Q the Company filed with the SEC on April 28, 2025 for the quarterly period ended March 31, 2025, between February 1, 2025 and February 28, 2025, the Company purchased 610,319 shares of its common stock for approximately $58,175,607, at an average price of $95.32 per share.

120.    As the Company's stock was actually worth only $62.94 per share, the price at closing on October 28, 2025, the Company overpaid by approximately $19,762,129 for

repurchases of its stock between February 1, 2025 and February 28, 2025.

121.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $19.8 million.

## DAMAGES TO ALEXANDRIA

122.    As a direct and proximate result of the Individual Defendants' conduct, Alexandria will lose and expend many millions of dollars.

123.    Such losses include approximately $19.8 million the Company overpaid when it repurchases its own stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

124.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its founder and Executive Chairman of the Board, its CEO and CIO, and its CFO and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

125.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

126.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, including payments of any fines or settlement amounts associated with the Company's violations.

127.    Additionally, these expenditures include, but are not limited to, excessive compensation and benefits, including payments made pursuant to the 2025 Amendment to the

1997 Plan, paid to the Individual Defendants who breached their fiduciary duties to the Company, and lucrative insider trading conducted by two of the Individual Defendants.

128.    As a direct and proximate result of the Individual Defendants' conduct, Alexandria has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## DERIVATIVE ALLEGATIONS

129.    Plaintiff brings this action derivatively and for the benefit of Alexandria to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Alexandria, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

130.    Alexandria is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

131.    Plaintiff is, and has been at all relevant times, a shareholder of Alexandria. Plaintiff will adequately and fairly represent the interests of Alexandria in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

132.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

133.    A pre-suit demand on the Board is futile and, therefore, excused. When this action

was filed, Alexandria's Board consisted of the following eight individuals: Defendants Marcus, Aldridge, Cain, Freire, Hash, Klein, McGrath, and Woronoff (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Director-Defendants that were on the Board at the time this action was filed.

134.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to engage in and/or cause the Company to make and/or cause the Company to make false and misleading statements and omissions of material facts, and as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by approximately $19.8 million for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

135.    Moreover, all of the Director-Defendants caused the 2025 Proxy Statement to call for a vote to approve the 2025 Amendment to the 1997 Plan, thereby increasing the number of shares available for issuance thereunder by 850,000 shares. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2025 Amendment to the 1997 Plan who would not have approved the 2025 Amendment to the 1997 Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2025 Amendment to the 1997 Plan at the annual meeting of stockholders of Alexandria on May 13,

2025, there were 3,965,506 shares available for issuance under the 1997 Plan. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for from the issuance of the false and misleading 2025 Proxy Statement and the shareholders approving the 2025 Amendment to the 1997 Plan that made an additional 850,000 shares available under the 1997 Plan. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

136.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Alexandria to issue materially false and misleading statements. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

137.     Additional reasons that demand on Defendant Marcus is futile to follow. Defendant Marcus is the Company's founder and has served as its Executive Chairman of the Board since April 23, 2018. Previously, Defendant Marcus served as the Company's CEO and President from the Company's founding in 1994 to April 2018. Defendant Marcus is also a member of the Life Science Committee. The Company provides Defendant Marcus with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is not an independent director. In addition, Defendant Marcus solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to: (1) re-elect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the 2025 Amendment to the 1997 Plan. As the Company's trusted Executive Chairman of the Board, Defendant Marcus conducted little, if any, oversight of the

schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made or signed many of the false and misleading statements alleged herein. Moreover, under the 2025 Amendment to the 1997 Plan, Defendant Marcus is eligible to receive stock awards under the 2025 Amendment to the 1997 Plan, thereby materially benefiting from the adoption of the 2025 Amendment to the 1997 Plan. He is also a defendant in the Securities Class Action. For these reasons, too, Defendant Marcus breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138.     Additional reasons that demand on Defendant Aldridge is futile follow. Defendant Aldridge has served as a Company director since March 14, 2025, and currently serves as a member of the Life Science Committee. Defendant Aldridge has received and continues to receive handsome compensation for her role as Company director. In addition, Defendant Aldridge solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to: (1) re-elect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the 2025 Amendment to the 1997 Plan. As a trusted, long-time Company director, she conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2025 Amendment to the 1997 Plan, Defendant Aldridge is eligible to receive stock awards under the 2025 Amendment to

the 1997 Plan, thereby materially benefiting from the adoption of the 2025 Amendment to the 1997 Plan. For these reasons, too, Defendant Aldridge breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

139.    Additional reasons that demand on Defendant Cain is futile follow. Defendant Cain has served as a Company director since December 2015. Defendant Cain currently serves as the Chair of the Nominating & Governance Committee, as a member of the Compensation Committee, and as a member of the Life Science Committee. Defendant Cain has received and continues to receive handsome compensation for his role as Company director. In addition, Defendant Cain solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to: (1) re-elect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the 2025 Amendment to the 1997 Plan. As a trusted, long-time Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2025 Amendment to the 1997 Plan, Defendant Cain is eligible to receive stock awards under the 2025 Amendment to the 1997 Plan, thereby materially benefiting from the adoption of the 2025 Amendment to the 1997 Plan. For these reasons, too, Defendant Cain breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

140.    Additional reasons that demand on Defendant Freire is futile follow. Defendant Freire has served as a Company director since April 2012. Defendant Freire also currently serves

as the Chair of the Life Science Committee and as a member of the Nominating & Governance Committee. Defendant Freire has received and continues to receive handsome compensation for her role as Company director. In addition, Defendant Freire solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to: (1) re-elect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the 2025 Amendment to the 1997 Plan. As a trusted, long-time Company director, she conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2025 Amendment to the 1997 Plan, Defendant Freire is eligible to receive stock awards under the 2025 Amendment to the 1997 Plan, thereby materially benefiting from the adoption of the 2025 Amendment to the 1997 Plan. For these reasons, too, Defendant Freire breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

141.    Additional reasons that demand on Defendant Hash is futile follow. Defendant Hash has served as a Company director since December 2013 and is currently the Lead Director of the Board. Defendant Hash currently serves as the Chair of the Compensation Committee and as a member of the Audit Committee. Defendant Hash has received and continues to receive handsome compensation for his role as Company director. In addition, Defendant Hash solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to: (1) re-elect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the 2025 Amendment to the 1997 Plan. As a trusted, long-time Company director, he conducted little, if any, oversight of the schemes to

cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2025 Amendment to the 1997 Plan, Defendant Hash is eligible to receive stock awards under the 2025 Amendment to the 1997 Plan, thereby materially benefiting from the adoption of the 2025 Amendment to the 1997 Plan. For these reasons, too, Defendant Hash breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142.    Additional reasons that demand on Defendant Klein is futile follow. Defendant Klein has served as a Company director since December 2003. Defendant Klein currently serves as the Chair of the Audit Committee, and as a member of the Compensation Committee. Defendant Klein has received and continues to receive handsome compensation for his role as Company director. In addition, Defendant Klein solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to: (1) re-elect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the 2025 Amendment to the 1997 Plan. As a trusted, long-time Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2025 Amendment to the 1997 Plan, Defendant Klein is eligible to receive stock awards under the 2025 Amendment to the 1997 Plan, thereby materially benefiting from the adoption of the 2025 Amendment to the 1997 Plan. For these reasons, too, Defendant Klein

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143.    Additional reasons that demand on Defendant McGrath is futile follow. Defendant McGrath has served as a Company director since December 2023. Defendant McGrath currently serves as a member of the Life Science Committee. Defendant McGrath has received and continues to receive handsome compensation for her role as Company director. In addition, Defendant McGrath solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to: (1) re-elect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the 2025 Amendment to the 1997 Plan. As a trusted, long-time Company director, she conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2025 Amendment to the 1997 Plan, Defendant McGrath is eligible to receive stock awards under the 2025 Amendment to the 1997 Plan, thereby materially benefiting from the adoption of the 2025 Amendment to the 1997 Plan. For these reasons, too, Defendant McGrath breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

144.    Additional reasons that demand on Defendant Woronoff is futile follow. Defendant Woronoff has served as a Company director since July 2017. Defendant Woronoff currently serves as a member of the Audit Committee, as a member of the Nominating & Governance Committee, and as a member of the Life Science Committee. Defendant Woronoff has received and continues to receive handsome compensation for his role as Company director. In addition, Defendant

Woronoff solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to: (1) re-elect the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the 2025 Amendment to the 1997 Plan. As a trusted, long-time Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2025 Amendment to the 1997 Plan, Defendant Woronoff is eligible to receive stock awards under the 2025 Amendment to the 1997 Plan, thereby materially benefiting from the adoption of the 2025 Amendment to the 1997 Plan. For these reasons, too, Defendant Woronoff breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.    Additional reasons that demand on the Board is futile follow.

146.    Defendants Klein (as Chair), Hash, and Woronoff (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and

procedures, and Business Integrity Policy. They also allowed the Company to violate GAAP and thus report artificially inflated and inaccurate financial metrics in its filings with the SEC throughout the Relevant Period. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

147.    In violation of the Business Integrity Policy, the Director-Defendants engaged in or permitted the schemes to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Business Integrity Policy by failing to act with integrity; failing to avoid conflicts of interest; failing to ensure the Company's disclosures were accurate; failing to ensure the Company complied with applicable laws, rules, and regulations; and failing to promptly report known violations of the Business Integrity Policy and the law. Thus, the Director-Defendants breached the Company's own Business Integrity Policy, are not disinterested, and demand is excused as to them.

148.    Alexandria has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Alexandria any part of the damages Alexandria suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

149.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim

exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

150.    The acts complained of herein constitute violations of fiduciary duties owed by Alexandria's officers and directors, and these acts are incapable of ratification.

151.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Alexandria. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Alexandria, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

152.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Alexandria to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that

event, as well.

153.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**
**Against Defendants Marcus, Aldridge, Cain, Freire, Hash, Klein, McGrath, and Woronoff**
**for Violations of Section 14(a) of the Exchange Act**

154.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

155.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

156.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

157.    Under the direction and watch of Defendants Marcus, Aldridge, Cain, Freire, Hash, Klein, McGrath, and Woronoff, the 2025 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Business Integrity Policy, the Individual

Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

158.    The 2025 Proxy Statement also failed to disclose that: (1) the Company's properties were experiencing lower occupancy rates and slower leasing activity; (2) the Company faced substantial real estate impairment charges with the majority of such charges being attributed to the Company's LIC property; (3) as a result of the lower occupancy rates, declining leasing activity, and real estate impairment charges, the Company would have to slash its FFO guidance for the full 2025 year; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants' statements were materially false and misleading at all relevant times.

159.    In the exercise of reasonable care, Defendants Marcus, Aldridge, Cain, Freire, Hash, Klein, McGrath, and Woronoff should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2025 Proxy Statement, including, but not limited to, the re-election of directors and approval of the 2025 Amendment to the 1997 Plan.

160.    As a result of Defendants Marcus, Aldridge, Cain, Freire, Hash, Klein, McGrath, and Woronoff causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Marcus, Aldridge, Cain, Freire, Hash, Klein, McGrath, and Woronoff to the Board until the next annual meeting of stockholders, thereby

allowing them to continue breaching their fiduciary duties to the Company; (2) approve the 2025 Amendment to the 1997 Plan; (3) approve, on advisory basis, the compensation of the Company's named executive officers; and (4) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accountants for the fiscal year ending December 31, 2025.

161.    The Company was damaged as a result of Defendants Marcus's, Aldridge's, Cain's, Freire's, Hash's, Klein's, McGrath's, and Woronoff's material misrepresentations and omissions in the 2025 Proxy Statement.

162.    Plaintiff, on behalf of Alexandria, has no adequate remedy at law.

## SECOND CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act**

163.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

164.    The Individual Defendants, by virtue of their positions with Alexandria and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Alexandria and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Alexandria to engage in the illegal conduct and practices complained of herein.

165.    Plaintiffs, on behalf of Alexandria, have no adequate remedy at law.

## THIRD CLAIM
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

166.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

64

167.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Alexandria. Not only is Alexandria now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Alexandria by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase thousands of its own shares at artificially-inflated prices, damaging Alexandria.

168.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

169.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Alexandria not misleading.

170.    The Individual Defendants, as top executives and directors of the Company are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Alexandria.

171.    The Individual Defendants acted with scienter during the Relevant Period, in that

they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

172.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

173.    Plaintiffs, on behalf of Alexandria, have no adequate remedy at law.

### FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

174.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Alexandria's business and affairs.

176.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

177.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Alexandria.

178.    In breach of their fiduciary duties owed to Alexandria, the Individual Defendants also willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's

properties were experiencing lower occupancy rates and slower leasing activity; (2) the Company faced substantial real estate impairment charges with the majority of such charges being attributed to the Company's LIC Property; (3) as a result of the lower occupancy rates, declining leasing activity, and real estate impairment charges, the Company would have to slash its FFO guidance for the full 2025 year; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants' statements were materially false and misleading at all relevant times.

179.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

180.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

181.    In yet further breach of their fiduciary duties, during the Relevant Period, while the Company's common stock was at artificially inflated prices before the fraud was exposed, the Individual Defendants caused the Company to repurchase thousands of shares of Company stock at artificially inflated prices, while two of the Individual Defendants engaged in lucrative insider sales, netting combined proceeds of approximately $702,305.

182.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with

reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

183.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

184.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Alexandria has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

185.    Plaintiff, on behalf of Alexandria, has no adequate remedy at law.

### FIFTH CLAIM
**Against the Individual Defendants for Unjust Enrichment**

186.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

187.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Alexandria.

188.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Alexandria that was tied to the performance or artificially inflated valuation of Alexandria or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

189.    Plaintiff, as a shareholder and representative of Alexandria, seeks restitution from

the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

190.    Plaintiff, on behalf of Alexandria, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

191.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

192.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Alexandria, for which they are legally responsible.

193.    As a direct and proximate result of the Individual Defendants' abuse of control, Alexandria has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

194.    Plaintiff, on behalf of Alexandria, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

195.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

196.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Alexandria in a manner consistent with the operations of a publicly held corporation.

197.    As    a    direct    and    proximate    result    of    the    Individual    Defendants'    gross

mismanagement and breaches of duty alleged herein, Alexandria has sustained and will continue to sustain significant damages.

198.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

199.    Plaintiff, on behalf of Alexandria, has no adequate remedy at law.

## EIGHTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

200.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

201.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

202.    In addition, the Individual Defendants caused the Company to repurchase its own common stock at artificially inflated prices, thereby wasting the Company's assets.

203.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

204.    Plaintiff, on behalf of Alexandria, has no adequate remedy at law.

## NINTH CLAIM
### Against Defendants Moglia, Binda, and Marcus for Contribution Under Sections 10(b) and 21D of the Exchange Act

205.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

206.    Alexandria and Defendants Moglia, Binda, and Marcus are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of

Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Moglia's, Binda's, and Marcus' willful and/or reckless violations of their obligations as officers and/or directors of Alexandria.

207.    Defendants Moglia, Binda, and Marcus, because of their positions of control and authority as officers, directors, and/or former officers of Alexandria, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Alexandria, including the wrongful acts complained of herein and in the Securities Class Action.

208.    Accordingly, Defendants Moglia, Binda, and Marcus are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

209.    As such, Alexandria is entitled to receive all appropriate contribution or indemnification from Defendants Moglia, Binda, and Marcus.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Alexandria, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Alexandria;

(c)    Determining and awarding to Alexandria the damages sustained by it as a

result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Alexandria and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Alexandria and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Alexandria to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Alexandria restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury.

Dated: February 3, 2026

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

_/s/Timothy Brown_
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

_Counsel for Plaintiff_

Docusign Envelope ID: B617552D-3AD4-4802-807D-4D228A47064F

## **VERIFICATION**

I, Artur de Albuquerque Torres, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of February, 2026.

Artur de Albuquerque Torres